Chicago College of Osteopathy, Appellant, v. Noble J. Puffer, as Director of Department of Registration and Education of State of Illinois, Appellee.

Gen. No. 46,129.

Opinion filed June 22, 1954. Released for publication July 9, 1954.

ESSINGTON, McKIBBIN, BEEBE & PRATT, of Chicago, and GIFFIN, WINNING, LINDNER & NEWKIRK, of Springfield, for appellant; MONTGOMERY S. WINNING, of Springfield, of counsel.

LATHAM CASTLE, Attorney General of State of Illinois, of Chicago, for appellee; WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, Assistant Attorneys General, all of Chicago, of counsel.

MR. JUSTICE ROBSON delivered the opinion of the court.

This is an action under the Administrative Review Act brought by the Chicago College of Osteopathy, plaintiff, to review a final administrative decision by Noble J. Puffer, as Director of the Department of

Registration and Education, defendant (hereinafter called Department), denying plaintiff's application for approval as a college whose graduates are permitted to take examinations conducted by the Department for a license to practice medicine in all its branches. Vera M. Binks, now Director of the Department, was substituted as defendant by order of the trial court without change in the title of the cause. The trial court conducted a hearing on the record made before the Department and affirmed the decision of the Department. Plaintiff appealed from this order.

The first question that we must decide is a motion of the Department, which was taken with the case, to dismiss the appeal on the ground that plaintiff failed to join as parties defendant the members of the Medical Examining Committee. Defendant in support of its contention cites as directly in point the case of *Cuny v. Annunzio*, 411 Ill. 613. This involved an appeal from a judgment of the superior court of Cook county affirming a decision of the Board of Review of the Department of Labor which approved the findings of the deputy and referee of the Division of Unemployment Compensation. The sole defendant named in the complaint was the Director of Labor of the State of Illinois, and a review was sought of the decision of the Board of Review of that department. The Director moved to dismiss the appeal on the ground that appellant had failed to join as parties defendant the Board of Review. The plaintiff contended that while the Board of Review is an administrative agency, it is not independent of the Director but is in reality a division of the Department. The Supreme Court held that the Board of Review was a necessary party defendant on appeal saying, at p. 616:

"The decision of the Board of Review in this cause terminates proceedings within the Department of

Labor and review of the Board's decisions on matters pertaining to unemployment compensation lies only to the circuit court or superior court. (Ill. Rev. Stat. 1945, chap. 48, par. 230.) Thus, while the Board of Review may be a division or arm of the Department of Labor which operates under the superintendence of a Director, it is the Board which acted as the administrative agency and entered the administrative decision, and is the party contemplated by section 8 of the Administrative Review Act."

It is clear from this decision that the Board of Review was independent of the Director of Labor and could make final decisions. (Ill. Rev. Stat. 1945, chap. 127, par. 44a [Jones Ill. Stats. Ann. 126.164(1)].) It is also provided in chapter 48, paragraph 230 of the Unemployment Compensation Act (Ill. Rev. Stat. 1945 [Jones Ill. Stats. Ann. 45.141]) that the Director or Board of Review, as the case may be, shall be competent to make "final administrative decisions" and that the "Board of Review or the Director, as the case may be, shall certify the record of the proceedings to the Circuit or Superior Court. . . ." (Cf. *Abbott Publishing Co. v. Annunzio*, 414 Ill. 559.)

██ We have examined the comparable provisions of the Medical Practice Act (Ill. Rev. Stat. 1951, chap. 91 [Jones Ill. Stats. Ann. 79.01–79.40]) and we find no provision giving the Medical Examining Committee a like degree of independence of the Director of Registration and Education. The Department contends that paragraph 60a of the Civil Administrative Code (Ill. Rev. Stat. 1951, chap. 127, par. 60a [Jones Ill. Stats. Ann. 126.189]) authorizes the Medical Examining Committee to function as an administrative agency within the purview of paragraph 8 of the Administrative Review Act (Ill. Rev. Stat. 1951, chap. 110, par.

271 [Jones Ill. Stats. Ann. 104.094(8)]). Paragraph 8 reads:

"In any action to review any final decision of an administrative agency, the administrative agency and all persons, other than the plaintiff, who were parties of record to the proceedings before the administrative agency shall be made defendants."

Paragraph 60a reads:

"None of the functions, and duties enumerated in section 60 of this Act shall be exercised by the Department of Registration and Education except upon the action and report in writing of a committee which shall be composed of persons designated from time to time or as hereinafter set forth by the Director of Registration and Education to take such action and to make such report, for the respective professions, trades and occupations . . . ."

 In our opinion paragraph 60a makes it clear that the Medical Examining Committee exercises no final decision-making powers. It is merely a fact-finding body that makes recommendations in a report to the Director. *Bodenweiser v. Department of Registration & Education,* 347 Ill. 115, 121; *Schireson v. Walsh,* 354 Ill. 40, 55; *Smith v. Department of Registration & Education,* 412 Ill. 332, 333; and see, generally, 18 A.L.R.2d 606 *et seq.* The Director, though not possessing power to act without the Committee's recommendations, in his sole discretion decides whether the Committee's findings and recommendations shall be adopted by him and become final or the matter returned to the same committee or another for rehearing. (Ill. Rev. Stats. 1951, chap. 91, pars. 16b–1, 16d; chap. 127, pars. 60, 60a [Jones Ill. Stats. Ann. 79.18(1), 79.20, 126.188, 126.189].) An appeal may be had to the circuit or superior courts only if he adopts the findings and recommendations of the Committee. This case is,

therefore, clearly distinguishable from *Cuny v. Annunzio, supra,* where the action of the Board terminated the proceedings.

 Prior to the Illinois Administrative Review Act of 1945, review of an administrative agency's decision was generally by way of the common-law writ of certiorari. (See, e. g., par. 17, Medical Practice Act, Laws 1923, p. 436; chap. 91, par. 16b, Smith-Hurd Ann. Stat.) By that procedure, many cases were on review prosecuted against the Director or the Department. (See e. g., *Schireson v. Walsh, supra; Bodenweiser v. Department of Registration & Education, supra;* and see Ill. Rev. Stat. 1951, chap. 127, par. 4 [Jones Ill. Stats. Ann. 126.123].) Return to the writ was made by the Director. (Cf. Ill. Rev. Stat. 1945, chap. 48, par. 230 [Jones Ill. Stats. Ann. 45.141].) The Administrative Review Act of 1945 did not reorganize the sources of power and authority vested by other Acts in the several offices or officers of any one department. It primarily effected uniform administrative review procedure and broader review on appeal from the administrative agency's final decisions. Under the Act, the Director of Registration and Education remains the official empowered to certify and file the record of administrative proceedings on appeal. (See Ill. Rev. Stat. 1951, chap. 91, par. 16b–3; chap. 127, par. 4; and cf. Ill. Rev. Stat. 1951, chap. 48, par. 520 [Jones Ill. Stats. Ann. 79.18(3), 126.123, 45.211].)

 We are of the opinion that the Medical Examining committee is not a final decision-making body under paragraph 8 of the Administrative Review Act. Therefore its members were not necessary parties defendant in this proceeding. Defendant's motion to dismiss is denied.

The next question is whether the Department was lawfully justified in denying plaintiff's application. The decision of the Department was based upon its

adoption of six findings of the Medical Examining Committee holding that the plaintiff had failed to comply with certain fixed rules and standards of the Department for approval as a medical college. These rules and standards were promulgated pursuant to sections 19 and 20 of the Medical Practice Act of 1923. (Laws 1923, p. 436, Smith-Hurd Ann. Stat. chap. 91, secs. 16d and 16e [Jones Ill. Stats. Ann. 79.20, 79.21].) For a proper understanding of this controversy, it is necessary to review some of its history.

The Medical Practice Act of 1899 was held unconstitutional because of its discriminatory provisions against osteopaths. *People v. Schaeffer,* 310 Ill. 574. The court said at p. 583:

"This statute therefore tends to deprive the osteopaths of their constitutional right to practice surgery, who are, so far as this record shows, just as efficient and as well prepared by college and hospital training to practice surgery as are the physicians of the medical schools. The act is therefore void as to such physicians so deprived."

The same type of discrimination appeared in the Medical Practice Act of 1917, and that was held unconstitutional. *People v. Love,* 298 Ill. 304. In the case of *People v. Witte,* 315 Ill. 282, in which the Supreme Court had for consideration the constitutionality of the present Medical Practice Act, it said, construing the subsections of sections 19 and 20, at p. 292:

"The first subsection of section 19 requires the department to make rules for establishing reasonable minimum standards of educational requirements to be observed by medical colleges, or by any professional school, college or institution teaching any system or method of treating human ailments, and to determine the reputability and good standing of all schools, colleges and institutions. By the twentieth section it is

76

provided that the provisions of the act shall not be so construed as to discriminate against any system or method of treating human ailments, or against any medical college or any professional school, college or institution teaching any system or method of treating human ailments, on account of any such system or method which may be taught or emphasized in such medical college or in any such professional school, college or institution. Hence the act requires the making of rules and regulations under which all examinations shall be conducted; it enjoins uniformity in examinations, so far as their nature will permit; it imposes the duty of making rules for establishing reasonable minimum standards of educational requirements, and it expressly prohibits discrimination against any system or method of treating human ailments or against any medical school or college whatever. The department is not permitted, under the act, arbitrarily to prescribe minimum standards of educational requirements nor conduct examinations of applicants for licenses according to its arbitrary whim or caprice. The rules and regulations promulgated by the department are subject to review by the courts to determine whether or not they are reasonable."

It is encumbent upon us on the basis of the record to determine whether the rules and regulations of the Department are fair; whether the plaintiff has substantially complied with these rules and regulations and whether discrimination has been practiced against it in the findings made by the Medical Examining Committee and in the approval of its findings by the Department.

The relevant parts of the lengthy record reveal the following: On May 19, 1949, plaintiff made its application and at the request of the Department submitted information to the Medical Examining Committee pre-

liminary to a complete investigation of the hospital. Correspondence was had with the chairman of the Committee pertaining to it. An examination of the school was made by the Committee on October 20, 1949. A lengthy report was filed by plaintiff setting forth the organization, administration, property statement, equipment valuation, teaching plant, faculty, student enrollment and intern placement, as requested by the Committee. Later extensive supplemental information was furnished.

On April 3, 1950, the Medical Examining Committee unanimously recommended that the application of plaintiff be denied on six grounds. On April 12, 1950, in a letter signed by the defendant, the plaintiff was informed of the action of the Medical Examining Committee. On April 14, 1950, plaintiff appealed from the report of the Medical Examining Committee to the Department and asked for a rehearing. The rehearing was allowed and set for August 10, 1950, before the same Medical Examining Committee. Plaintiff introduced testimony of various individuals and filed numerous exhibits in support of its petition. The Department introduced no proof to controvert it and plaintiff's record, therefore, stands unchallenged.

The 1923 Medical Practice Act required the Department to make rules establishing reasonable minimum standards of educational requirements for colleges whose graduates would be permitted to take examinations under the Act. Yet twenty years after the passage of that Act no such rules had been adopted by the Department. In 1941 a committee was appointed by the Illinois Osteopathic Association, which included the president of the plaintiff's Board of Trustees, to negotiate with the Department of Registration and Education for the purpose of seeing whether the Department would approve plaintiff so that its graduates would be permitted to take examinations for a license

to practice medicine in all its branches. The Committee had many meetings with the then Director of Registration and Education and with the Medical Examining Committee of the Department and requested that rules be adopted as required by the Medical Practice Act so that plaintiff would know what would be required of it in order to secure approval by the Department. Plaintiff had been and is approved by the Department as a college whose graduates are permitted to take examinations for a license to treat human ailments without the use of drugs and without operative surgery. The Committee was not successful in getting the Department to adopt rules.

In 1943 an original application for a writ of mandamus was presented to the Supreme Court of Illinois on the relation of the president of the Board of Trustees of plaintiff. The court allowed the motion for leave to file the petition. The Department promptly adopted rules as prayed for in the petition and filed them as a part of its answer to said petition. After the adoption of rules by the Department, the plaintiff in May 1949, submitted its application to the Department for approval as a college whose graduates would be admitted to examinations for a license to practice medicine in all its branches.

Plaintiff was incorporated as a not-for-profit educational institution in the State of Illinois in 1913. Since 1918 it has owned one block of land in Chicago, Illinois, on which are located buildings containing classrooms, laboratories, library, outpatient department and a 100-bed hospital. It is affiliated for teaching purposes with the Detroit Osteopathic Hospital in Detroit, Michigan, which has 160 beds. Plaintiff's students in their senior year spend three months at the Detroit hospital where they receive instruction in surgery. Plaintiff has a faculty of 64 people of professional rank; has 215 employees and operates on an

79

annual budget of $700,000. Its educational program has been accepted by every state and federal agency to which it has applied with the exception of the State of Illinois. It teaches materia medica, therapeutics, surgery, obstetrics and theory and practice. These subjects parallel the instruction given in medical institutions in the method of presentation, scope, textbooks used, qualifications of instructors and clinical hours. Its graduates are permitted by the following States and other jurisdictions to take examinations for an unlimited license to practice medicine: Indiana, New Jersey, New York, Ohio, Wisconsin, Colorado, Connecticut, Delaware, District of Columbia, Kentucky, New Hampshire, Oregon, Rhode Island, South Dakota, Texas, Virginia, Wyoming, Arizona, California, Florida, Hawaii, Iowa, Maine, Michigan, Missouri, Nevada, New Mexico, Oklahoma, Pennsylvania, Tennessee, Utah, Vermont, Washington and West Virginia. The student enrollment for the year 1950–1951 was 242. Of 242 students graduated by plaintiff in the last ten years, 196 went to states where they were permitted to take examinations for an unlimited license and all of them passed the examinations for an unlimited license, eighty per cent passing on the first examination.

Two doctors who had no connection with plaintiff's institution testified on its behalf. The first was Dr. Eric Oldberg, who is head of the Department of Neurology and Neurological Surgery of the Medical School of the University of Illinois, head of the service at the Illinois Neuropsychiatric Institute and Chief of Service of Neurology and Neurological Surgery at the Illinois Research and Educational Hospitals. He is one of the outstanding brain surgeons in the United States. He testified that he is familiar with the way hospitals are run and the way a teaching hospital should be operated. He said that plaintiff's hospital

is one of the best hospitals of this type in Chicago and is run competently and efficiently. He further said that when plaintiff's hospital referred a patient to his office, the patient came to him with a very complete resumé of all the history, findings and laboratory work, which was accurate and adequate, and that his impression of the hospital is excellent. He knew eight or ten of the doctors at plaintiff's hospital and he considered them competent. Doctor Charles Laury, who is a consultant at the Illinois Central Hospital, the Chicago Board of Health and also at plaintiff's hospital, testified substantially to the same effect as Dr. Oldberg.

The only colleges approved by the Department whose graduates are permitted to take examination for license to practice medicine in all its branches, or to receive a full license by reciprocity with another State, are those which grant the degree of Doctor of Medicine.

The first ground for denying plaintiff's application as stated by the Medical Examining Committee in its recommendations and approved by the Director in his decision reads as follows:

"1. Rule 5 on page 3, entitled 'Premedical Education, College Preparatory,' among other things, provides for a minimum of 16 hours of Chemistry and 8 hours of English, while a review of the catalogue of the Chicago College of Osteopathy shows failure to meet that requirement, in that their minimum requirement is 12 hours of Chemistry and 6 hours of English."

The evidence shows that at the time plaintiff was inspected it required twelve hours of Chemistry and six hours in English, College Preparatory, as a minimum for entrance to the college and that since that time the requirements in Chemistry have been raised. This rule is not strictly enforced against medical colleges which grant the degree of Doctor of Medicine.

81

Twenty-seven of such medical colleges of the eighty approved by the Department require only six hours of English, College Preparatory, as an entrance requirement. In the list are Northwestern University, Loyola University, University of Illinois, University of Michigan, University of Wisconsin, Ohio State, St. Louis University, Washington University, Stanford University and University of Southern California. Seventeen of the medical colleges of the eighty approved by the Department require less than 16 hours of Chemistry, College Preparatory, as an entrance requirement, including such colleges as New York University, St. Louis University, University of Nebraska, Vanderbilt University and Western Reserve University. More than one half of such medical colleges approved by the Department fails to meet the requirements of this rule.

The second ground for denying plaintiff's application reads as follows:

"2. In Rule 7 on page 4, the Department rules require a minimum of 5119 didactic and laboratory hours for graduation. The said Chicago College of Osteopathy fails to meet that requirement, in that the minimum number of hours they require in didactic and laboratory instruction is 4872 hours."

The evidence shows that the minimum number of didactic and laboratory hours required by plaintiff for graduation is 4872. This rule is not enforced against medical colleges which grant the degree of Doctor of Medicine. Twenty-one of such medical colleges of the eighty approved by the Department require for graduation less than the number of hours provided in this rule, including Harvard University, Indiana University, Northwestern University, University of Michigan and University of Illinois.

The third ground for denying plaintiff's application reads as follows:

"3. Under Section 5(a), 'Faculty Requirements,' the Department rules require a school to provide at least six expert, thoroughly trained professors in the laboratory branches who shall devote their entire time to the college in instruction or research. The catalogue of the Chicago College of Osteopathy shows that they have only three men of professorial rank as full time instructors in basic sciences."

The evidence shows that at the time of the inspection and at the time of the hearing, plaintiff had seven full-time instructors of professorial rank.

The fourth ground for denying plaintiff's application reads as follows:

"4. The Chicago College of Osteopathy also fails to comply with Section 5(b) of the Department rules which is quoted below, since its catalogue shows the names of only two licensed physicians and surgeons as members of the faculty:

" 'The faculty should be composed of graduates of institutions recognized as reputable medical colleges who have had training in all departments of medicine. Non-medical men should be selected as teachers in medical colleges, only under exceptional circumstances, and only when medical men of equal special capacity are not available. The faculty should be organized, each department having as its head professor a physician and surgeon who shall be licensed to practice medicine in all of its branches in the state in which the medical college is located, and who shall have practiced his profession at least 10 years, and has devoted the five years next preceding such engagement to the exclusive practice of the specialty in which he is proficient, its associate professor, assistant professor, instructor, etc., each having his particular subjects for

83

the teaching of which he is responsible to the head of the department.' "

The evidence shows that the head of plaintiff's Department of Surgery is fully qualified under the rule. He has 19 men of professorial rank under him who teach the subject, some of whom are located at the Detroit Osteopathic Hospital. Fourteen of these men are licensed by the State in which they teach to practice medicine in all its branches and all the instructors are trained in all branches of medicine and surgery.

The head of the Department of Medicine is a graduate of plaintiff's college and holds licenses to practice medicine in all its branches in the States of California, Florida, Michigan and Missouri. He is assisted by 22 men of professorial rank. Five of these teach in the Detroit hospital and have an unlimited license in the State of Michigan. Nine of the instructors in Illinois hold an unlimited license in other states but none has an unlimited license in the State of Illinois. All the instructors are fully trained in all departments of medicine and have had more than the minimum of experience required by the rule in the practice of their profession and in teaching.

Plaintiff has four men of professorial rank in its Department of Obstetrics. Two of them are located at the college in Chicago and are licensed by the State of Illinois to practice obstetrics. The head of the department satisfies the rule of the Department in reference to the length of time he has practiced and the length of time that he has devoted to his specialty. The other two professors in this department are located at the Detroit Osteopathic Hospital and have an unlimited license to practice in the State of Michigan.

Two men teaching at plaintiff's college in Chicago have the degree of Doctor of Medicine and are licensed by the State of Illinois to practice medicine in all its

84

branches. The plaintiff has endeavored to obtain as members of its teaching staff other men who hold the degree of Doctor of Medicine and who are licensed by the State of Illinois to practice medicine. Those so qualified have refused to accept an appointment to teach at the Chicago college because of the attitude of the Medical Associations toward the osteopathic profession.

There is no reason from an educational standpoint why a teacher at the Chicago College of Osteopathy should hold an Illinois license to practice medicine in all its branches except where the teacher actually performs surgical operations or prescribes drugs. A great part of medical teaching in the preclinical years is done by men who in many schools are not licensed and have no contact with the treatment of patients. In the clinical years the teaching of the practice of medicine, practice of surgery and the practice of obstetrics covers a wide field, consisting of ideology, diagnosis, pathology, prognosis, therapy and management, and it is only a part of the teaching and training in these subjects that is concerned with the actual prescription of drugs or the actual performance of surgical operations. The men who do these things at plaintiff's college are fully licensed. The same amount of time is spent at plaintiff's college in the actual surgical procedure or the actual writing of prescriptions as is spent in medical colleges and the same amount of time is given to all the other phases of teaching as is given in medical colleges.

A number of medical schools which grant the degree of Doctor of Medicine and are approved by the Department of Registration and Education have department heads who do not hold the degree of Doctor of Medicine and who are not licensed to practice medicine in all its branches in the State in which they teach. In-

cluded among these medical schools are Harvard University, Loyola University, Indiana University, University of Illinois and University of Wisconsin.

The fifth ground for denying plaintiff's application reads as follows:

"5. The number of anatomy tables provided by the Chicago College of Osteopathy is inadequate for the number of students in the freshman class, since they have only 12 tables for 68 students. The usual practice followed by approved medical colleges is four students to one table."

The evidence shows that there is nothing in the rules specifying the number of tables for dissection. The requirement for an approved medical college is that each student must dissect the lateral half of a cadaver. It is impossible for any medical school in Chicago to comply with that requirement because the supply of cadavers is not sufficient. All medical schools in Chicago are allotted one cadaver to each four students, which means that two students dissect the lateral half of the human cadaver. The plaintiff received cadavers in the same ratio to the number of students as the medical colleges.

The sixth ground for denying plaintiff's application reads as follows:

"6. Under Section 7, 'Clinical Resources,' the Department rules provide that the work of the student at all times shall be under the guidance of a competent instructor who shall hold a license to practice medicine and surgery in all its branches, and since there are only two physicians and surgeons on the faculty of the Chicago College of Osteopathy who are licensed in Illinois, it is impossible for them to supervise all students in the college."

The evidence shows that the clinical training in the college begins in the third year, at which time the

students are in attendance at the outpatient department. They are assigned the same duties and are supervised in the same manner as in other medical schools. They spend during that year 570 hours in clinical instruction. The students in their senior year spend three months in the outpatient department. The clinical staff devotes its entire time to the care of patients in the clinic during that period. For another three months in the senior year these students are in the Chicago Osteopathic Hospital, during which their time is divided between the various sections. Senior students spend twelve weeks externship at the Detroit Osteopathic Hospital. All the instructors at the Detroit Osteopathic Hospital who teach students of the plaintiff are licensed to practice medicine without any limitation in the State of Michigan. Two of the instructors at plaintiff's college in Chicago are licensed to practice medicine in all its branches in the State of Illinois. Students of the college while studying in Chicago are under their guidance and supervision. Plaintiff showed the same reason for its inability to get instructors who hold a degree of Doctor of Medicine as it did under point 4. The professors who teach materia medica, therapeutics, surgery and theory, and practice, are qualified teachers and the instruction at plaintiff's college compares favorably with the instruction given at Northwestern University Medical School. A record has been kept of graduates from plaintiff's college and, in the case of graduates for the years 1942–49, eighty-eight per cent have passed licensing examinations for a full license in States where they are permitted to take the examination.

We have set forth the record in this case in detail to show the complete background of plaintiff's efforts to obtain approval of its college and to ascertain if there has been discrimination against it. We are not called upon to decide whether the practice of osteop-

athy has a sound basis in medical theory. We cannot and do not have any opinion on that. The legislature has authorized the practice of osteopathy. The sole question before us is whether a school which teaches osteopathy may at the same time upon the same standards and same conditions as are applied to other schools, teach its students the practice of medicine and surgery and by the same standards have its graduates permitted to take the examination for the practice of medicine. That is the question which is here involved.

In 1924 our Supreme Court found that on the record before it, a defendant, an osteopath, was as well prepared by college and hospital training to practice surgery as are the physicians in the medical schools. *People v. Schaeffer,* 310 Ill. 574.

The record clearly shows that for schools granting a decree of Doctor of Medicine the Department sets a very liberal standard for the interpretation of its rules and as to the plaintiff the interpretation is very strict. In each instance, under the six specifications where it was found by the Department that plaintiff did not meet the minimal requirements, the record shows that the finding of the Department was against the undisputed evidence, that plaintiff's entrance requirements, method of education and staff organization were substantially the same as other leading medical schools of the country that had been approved by the Department. Where faculty members did not meet the requirement that they be graduates of reputable medical colleges, it was proved that the faculty members were licensed to practice medicine in all its branches in other States but had a degree of Doctor of Osteopathy which did not meet the requirement of the Department. Plaintiff proved that it endeavored to obtain men with the degree of Doctor of Medicine but that such men refused to accept appointment because of the attitude of the Medical Associa-

tions toward the osteopathic profession. Dr. Eric Old-berg, one of the outstanding leaders of the medical profession in this State, testified that plaintiff's teaching hospital was one of the best in Chicago and was run competently and efficiently. We conclude, therefore, on the basis of the record in this case, that plaintiff conducts a college for the teaching of all branches of medicine and maintains the same high standards as do the medical colleges approved by the Department of Registration and Education.

■ Applying the law as announced in *People v. Witte, supra,* to the record before us, we are of the opinion that the plaintiff, when judged by the standards which the Department has applied to other medical schools, has substantially complied with the minimum requirements of the rules, and that the Department was unjust, arbitrary and discriminatory as to the plaintiff in the enforcement of the rules. It therefore violated the requirements of section 20 of the Medical Practice Act [Ill. Rev. Stats. 1953, ch. 91, § 16e; Jones Ill. Stats. Ann. 79.21].

■ The Department's reply to plaintiff's argument on discrimination has very little substance and cites no cases in support of its position. It suggests, however, that if there is any foundation in fact for plaintiff's complaint, the only remedy to which it is entitled is a writ of mandamus to compel the Department to enforce its rules without discrimination. To this the plaintiff has replied that the record shows that the Department has engaged in a practice of discrimination against plaintiff and that it accomplishes this result by adopting rules with which literal compliance is difficult; that it rigidly applies these rules to the plaintiff but, as to other medical schools, ignores the rules or grants a liberal interpretation. Plaintiff says that it is entitled to equal treatment under the law (sec. 20 Medical Practice Act and cases heretofore cited)

and that the way this can be accomplished is for the courts to compare its standards of substantial compliance with the standards actually applied to the accredited schools by the Department. Mandamus affords no remedy because the Department would pursue its policy of discrimination and find a way either by new rules or by their interpretation to avoid equal treatment for the plaintiff. The history of the controversy as it is revealed by the record and as we have related it substantiates plaintiff's position.

Is there a principle of law under which a court can give plaintiff the relief which it seeks? The principle of uniformity and equality before the law was applied in tax cases at an early date. *Chicago & Northwestern Railway Co. v. Boone County Board of Sup'rs,* 44 Ill. 240. This case involved the claim of taxpayers that they had been discriminated against in the valuation of their property and were entitled to relief even though their property had not been assessed more than its actual value. The court said at p. 243:

"No warrant is given, if the law is not strictly observed in the case of individuals, and their property is not assessed at its actual value, that the property of a corporation situate in the same county, shall be assessed at greater proportional value than that of individuals, even though the enhanced assessment is not on the actual cash value of the property of such corporation. The same rule which is applied to individuals, justice and the Constitution demand shall be applied to corporations."

Affirmative relief was granted to the plaintiff. In subsequent cases over the years, taxpayers, where they have shown deliberate or flagrant discrimination against themselves in the assessment of their property, have been granted similar relief. *People's Gas Light & Coke Co. v. Stuckart,* 286 Ill. 164, 173; *People v.*

*Grand Trunk R. Co.,* 357 Ill. 493, 497; *People v. Gillespie,* 358 Ill. 40, 46; *People v. Chicago, M., St. P. & P. R. Co.,* 381 Ill. 58, 62; *National-Ben Franklin Fire Ins. Co. of Pittsburgh, Pa. v. Brenza,* 411 Ill. 337, 344.

It is our conclusion based on the record that with respect to schools which grant the degree of Doctor of Medicine the Department has considered as a substantial compliance with its rules the same or even a lower measure than that which it has applied to the plaintiff. We are of the opinion that this has been done with the intent to discriminate and that to deny plaintiff the relief sought would be to condone an evasion of the statute (sec. 20 Medical Practice Act) and of the decision of the Supreme Court (*People v. Witte, supra*). The plaintiff has substantially complied with the requirements in accordance with the standards which the Department has in practice applied, and the Department should approve its application.

The judgment of the trial court is reversed and this cause remanded with directions to refer the matter back to the Department of Registration and Education for the entry of an order approving plaintiff's application.

*Judgment reversed and cause remanded with directions.*

SCHWARTZ, P. J., concurs.

TUOHY, J., took no part.