(No. 33387█

CHICAGO COLLEGE OF OSTEOPATHY, Appellee, *vs.* NOBLE J. PUFFER, Director of the Department of Registration and Education, Appellant.

*Opinion filed April 19, 1955.*

LATHAM CASTLE, Attorney General, of Springfield, (JOHN L. DAVIDSON, JR., and MARK O. ROBERTS, of counsel,) for appellant.

ESSINGTON, MCKIBBIN, BEEBE & PRATT, of Chicago, and GIFFIN, WINNING, LINDNER & NEWKIRK, of Springfield, (MONTGOMERY WINNING, of counsel,) for appellee.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

This is an appeal from a decision of the Appellate Court, First District, reversing the superior court of Cook County, which in a proceeding under the Administrative Review Act had affirmed an administrative decision of Noble J. Puffer, Director of the Department of Registration and Education.

On May 31, 1949, the Chicago College of Osteopathy (herein called plaintiff) filed an application with the Department pursuant to the Medical Practice Act (Ill. Rev. Stat. 1949, chap. 91, pars. 1 *et seq.*) for inspection and approval as a college "reputable and in good standing" for the teaching of students in the treatment of human ailments, so that graduates thereof would be permitted to take the examination for a license to practice medicine in all of its branches in Illinois.

An inspection of the plaintiff college was made by the Medical Examining Committee. After a hearing, the committee filed a report with the Department in which it recommended that the application be denied for failure to meet the statutory requirements and the rules and regulations adopted by the Department for approved medical colleges. The specific reasons assigned for refusing recognition were as follows:

"(1) Rule 5 on page 3, entitled 'Premedical Education, College Preparatory,' among other things, provides for a minimum of 16 hours of Chemistry and 8 hours of English, while a review of the catalogue of the Chicago College of Osteopathy shows failure to meet this requirement, in that their minimum requirement is 12 hours of Chemistry and 6 hours of English.

"(2) In Rule 7 on page 4, the Department rules require a minimum of 5119 didactic and laboratory hours for graduation. The said Chicago College of Osteopathy fails to meet that requirement in that the minimum number of hours they require in didactic and laboratory instruction is 4872 hours.

"(3) Under Section 5(a), 'Faculty Requirements,' the Department rules require a school to provide at least 6 expert, thoroughly trained professors in the laboratory branches who shall devote their entire time to the college in instruction and research. The catalogue of the Chicago College of Osteopathy shows that they have only 3 men of professorial rank as full time instructors in basic sciences.

"(4) The Chicago College of Osteopathy also fails to comply with Section 5(b) of the Department rules which is quoted below, since its catalogue shows the names of only 2 licensed physicians and surgeons as members of the faculty: 'The faculty should be composed of graduates of institutions recognized as reputable medical colleges, who have had training in all departments of medicine. Non-medical men should be selected as teachers in medical colleges only under exceptional circumstances, and only when medical men of equal special capacity are not available. The faculty should be organized, each department having as its head professor a physician and surgeon who shall be licensed to practice medicine in all of its branches in the state in which the medical college is located, and who shall have practiced his profession at least ten years, and has devoted the five years next preceding such engagement to the exclusive practice of the specialty in which he is proficient, its associate professor, assistant professor, instructor, etc., each having his particular subjects for the teaching of which he is responsible to the head of the department.'

"(5) The number of anatomy tables provided by the Chicago College of Osteopathy is inadequate for the number of students in the freshmen class, since they have only 12 tables for 68 students. The usual practice followed by approved medical colleges is 4 students to one table.

"(6) Under Section 7 'Clinical Resources,' the Department rules provide that the work of the student at all times shall be under the guidance of a competent instructor who shall hold a license to practice medicine and surgery in all its branches, and since there are only two physicians and surgeons on the faculty of the Chicago College of Osteopathy who are licensed in Illinois, it is impossible for them to supervise all students in the college."

The Department, in denying the application, approved and adopted the report and recommendations of the committee.

The plaintiff then petitioned for a rehearing, and upon rehearing held August 10, 1950, offered certain evidence. The committee again recommended the denial of the application, and the Department adopted that recommendation. This final administrative determination of the Department was based upon both the findings of the committee, quoted above, and the evidence adduced upon rehearing in opposition to the findings.

The superior court of Cook County affirmed the decision of the Department, and the Appellate Court reversed and remanded the cause with directions to refer the matter to the Department for the entry of an order approving plaintiff's application. (*Chicago College of Osteopathy* v. *Puffer,* 3 Ill. App. 2d 69.) We allowed the Department's petition for leave to appeal.

The Appellate Court, as a basis for remanding the case to the Department for the entry of an order approving the plaintiff's application, was of the opinion that the plaintiff had substantially complied with the requirements in accordance with the standards which the Department has in practice applied. The Department contends that the Appellate Court wrongfully substituted its own judgment for that of the Department, thereby usurping the function of said administrative agency.

The position of the Department may be summarized as follows: The legislature has delegated to the Department, acting upon a report of the examining committee, the function of approving and accrediting colleges whose graduates may be allowed to take an examination for a license to practice medicine in all its branches in Illinois. The Department properly exercised said statutory power in this case and its action in denying the application of the plaintiff college was in accord with the law and the evidence. Since the plaintiff admittedly failed to satisfy the rules of

the Department in the particulars stated, and since it is not argued that said rules establish unconstitutional requirements, the judgment of the superior court of Cook County should be affirmed.

The plaintiff, in urging us to affirm the Appellate Court, contends the record in this case fully supports the conclusion reached by that court, since the action of the Department in denying plaintiff's application constituted a violation of sections 19 and 20 of the Medical Practice Act. The Department, it is argued, violated section 20 by requiring the plaintiff to meet higher standards for approval than the standards generally required of colleges which grant the degree of Doctor of Medicine.

The present Medical Practice Act was passed in 1923, and its constitutionality was upheld in *People* v. *Witte,* 315 Ill. 282. The legislative plan approved in that case divides licenses, so far as physicians are concerned, into two classes—one which confers the right to practice medicine in all of its branches, and the other to treat human ailments without the use of drugs or medicines and without operative surgery. (Ill. Rev. Stat. 1949, chap 91, par. 11.) A similar classification is followed regarding minimum standards of professional education (Ill. Rev. Stat. 1949, chap. 91, par. 5,) and the scope of examinations. Ill. Rev. Stat. 1949, chap. 91, pars. 8, 9.

Section 19 of the act vests with the Department the power and duty to accredit professional colleges whose graduates may be allowed to take an examination for one or the other type of license. This section empowers the Department, among other things, "To make rules for establishing reasonable minimum standards of educational requirements to be observed by medical colleges, or by any professional school, college, or institution teaching any system or method of treating human ailments, or by colleges of midwifery, and to determine the reputability and good standing of all schools, colleges, and institutions now,

heretofore, or hereafter existing." (See also Ill. Rev. Stat. 1949, chap. 127, par. 60.) The Medical Practice Act further provides that none of the functions, powers and duties enumerated therein shall be exercised by the Department except upon the action and report in writing of the Medical Examining Committee. Ill. Rev. Stat. 1949, chap. 91, par. 16b-1; see also chap. 127, par. 60a.

It will be noted that section 19 makes it the *duty* of the Department to adopt reasonable standards of educational requirements to be observed by professional schools. Despite this clear legislative direction, the Department for a period of twenty years failed to adopt any such rules, and during that period no student who did not hold the degree of Doctor of Medicine was permitted to take the examination for an unlimited license. However, rules were adopted in 1943, but only after an original *mandamus* suit was begun by the plaintiff college asking this court to order the Department to take such action. The plaintiff thereafter made an effort to comply with the established rules, expending some $500,000 to this end, and in May, 1949, submitted its application for inspection and approval.

We turn next to section 20 of the act, which in effect prohibits discrimination against osteopaths and others similarly situated. This section, also contained in the Medical Practice Act of 1923, reads as follows: "The provisions of this Act shall not be so construed as to discriminate against any system or method of treating human ailments, or against any medical college, or any professional school, college or institution teaching any system or method of treating human ailments, on account of any such system or method which may be taught or emphasized in such medical college, or in such professional school, college or institution."

Section 20 was an affirmative declaration by the legislature of what this court said was required by the constitution in the administration of a medical practice act.

Provisions of prior medical practice acts which purported to authorize the very discrimination which the present act prohibited had been invalidated. In *People* v. *Schaeffer,* 310 Ill. 574, we declared the Medical Practice Act of 1899 unconstitutional in its application to osteopaths, for the reason that it provided that no applicant could take an examination for a license to practice medicine and surgery in all branches unless he was a graduate of a medical college, as distinguished from an osteopathic college. This court said at page 583: "The very great prejudice existing among many physicians of the medical schools against the osteopaths, and of the osteopaths against those of the medical schools, is well known. This statute recognizes both systems as meritorious because it allows both to treat human ailments according to their system, and it discriminates against the osteopath and seems to place the examinations of osteopaths to practice osteopathy entirely at the will and discretion of a medical board, as no one other than those educated in the medical system are qualified, under the act, to conduct the examinations provided for by it. This statute therefore tends to deprive the osteopaths of their constitutional right to practice surgery, who are, so far as this record shows, just as efficient and as well prepared by college and hospital training to practice surgery as are the physicians of the medical schools. The act is therefore void as to such physicians so deprived." See also *People* v. *Graham,* 311 Ill. 92.

The plaintiff college, which is located in Chicago, has been approved by the Department so that its graduates may take the examination for a limited license (*i.e.,* a license to treat human ailments without the use of drugs or medicines and without operative surgery), but in the instant application it seeks approval so that its graduates may take the examination for a license to practice medicine in all its branches. The examination for the limited license is the same as that given to applicants for a full license

except the latter are also examined on *materia medica,* therapeutics, surgery, obstetrics, and theory and practice. Ill. Rev. Stat. 1949, chap. 91, par. 9.

The evidence presented to the Department shows the following: The plaintiff was incorporated as a not-for-profit educational institution in Illinois in 1913, and since 1918 has had one block of land between Fifty-second and Fifty-third streets in Chicago on which are located buildings containing class rooms, laboratories, a library, an outpatient department and a one-hundred bed hospital. It has affiliated with it for teaching purposes the Detroit Osteopathic Hospital in Detroit, Michigan. Students in their senior year spend three months at this hospital where they receive additional instruction in surgery.

It is further shown that the plaintiff employs a faculty of sixty-four people, who are trained in all branches of medicine and surgery. It operates on an annual budget of $700,000, and at the time of the hearing its student enrollment was 214. Its educational program has been accepted by every agency, both Federal and State, to which it has applied, with the exception of the Department in Illinois, and in Illinois its graduates are permitted to take the examinations for a license to treat human ailments without the use of drugs and without operative surgery and for a license to practice obstetrics. It teaches *materia medica,* therapeutics, surgery, obstetrics, and theory and practice, and its instruction in these subjects parallels that given in approved medical institutions. Graduates of the plaintiff college are permitted by the following States and other jurisdictions to take examinations for an unlimited license to practice medicine: Indiana, New Jersey, New York, Ohio, Wisconsin, Colorado, Connecticut, Delaware, District of Columbia, Kentucky, New Hampshire, Oregon, Rhode Island, South Dakota, Texas, Virginia, Wyoming, Arizona, Florida, Hawaii, Iowa, Maine, Michigan, Missouri, Nevada, New Mexico, Oklahoma, Pennsylvania, Tennessee,

Utah, Vermont, Washington, and West Virginia. Of the 242 students graduated by plaintiff in the last ten years, 196 went to States where they were permitted to take examinations for an unlimited license and all of them passed, eighty per cent passing on the first examination.

We now come to the issue in the case, namely, whether the Department's denial of plaintiff's application was a proper exercise of its administrative function. Of all the complex and stringent requirements and standards established by departmental rules and regulations, it was found that the plaintiff failed to comply in six particulars. These findings of the Department, set out in full above, must be considered in detail with a view to determining: (1) Is the rule reasonable? (2) Is the finding supported by the evidence? and (3) Does the rule as applied amount to a violation of section 20 of the Medical Practice Act? .

*Finding No. 1* recited a violation of a rule providing for a minimum of 16 hours of Chemistry and 8 hours of English for admission to the school. It is conceded that at the time of the inspection the plaintiff required 12 hours of Chemistry and 6 hours of English.

Plaintiff insists, however, that this rule is not enforced by the Department against medical colleges which grant the degree of Doctor of Medicine and which have received the Department's approval. The results of a study made of catalogues of 45 of the 80 colleges approved by the Department disclosed that 27 of them required only 6 hours of English for admission, including Northwestern University (1948-9), University of Illinois (1948-9), and St. Louis University (1948-9). Moreover, it was established that 17 of these approved colleges required less than 16 hours of Chemistry, including New York University (1947-8), University of Nebraska (1947-8), and Western Reserve University (1948-9), each of which listed an admission requirement of 12 hours. Also introduced in evidence was a booklet published in 1950 by the Association

of American Medical Colleges which showed that 49 of the approved schools then had admission standards violative of this rule.

*Finding No. 2* recited a violation of a rule requiring a minimum of 5119 didactic and laboratory hours for graduation. The plaintiff's requirement in this regard was 4872 didactic and laboratory hours.

However, of the same 45 colleges referred to above, it was shown that 21 listed their hours in their catalogues as less than the number specified in this rule. For example, Harvard Medical School (1946-8) listed 4208, Indiana University (1948-9) listed 4716, Northwestern University (1948-9) listed 4707, Ohio State University (1948-9) listed 4836, and the University of Illinois (1949-50) listed 4629.

*Finding No. 3* recited a violation of a rule requiring a school to provide at least 6 experts, thoroughly trained professors in the laboratory branches who shall devote their entire time to the college in instruction and research. The Department based this violation on a finding that the catalogue of the plaintiff college showed that it had only 3 men of professorial rank as full time instructors in basic sciences.

We believe this finding is against the manifest weight of the evidence, for apart from the listing in the catalogue, the undisputed evidence establishes that at the time of the inspection there were 6 staff members who qualified under this rule. It is true that of the six, two were designated by the college as assistant professors, but we see no justification for reading the word "professors' as indicating the academic rank of full professor. Academic rank is a matter solely between the school and the teacher, and there is no necessary correlation between academic rank and teaching ability. In any event, the record shows without contradiction that on the staff of the plaintiff college were 6 expert, thoroughly trained teachers in the laboratory

branches who devoted their entire time to the college of instruction and research.

*Finding No. 4* recited a failure to comply with a rule of the Department pertaining to faculty requirements. This rule, quoted in full above, contains four requirements: (1) The faculty should be composed of graduates of institutions recognized as reputable medical colleges who have had training in all departments of medicine, with a provision that nonmedical men should be selected as teachers in medical colleges only under exceptional circumstances and only when medical men of equal special capacity are not available. (2) Heads of departments must be licensed to practice medicine in all of its branches in the State in which the medical college is located. (3) Heads of departments must have practiced their profession for ten years, five of which must be devoted exclusively to their particular specialty. (4) Departments must be manned by proper associates and assistants.

It is with reference to this finding that the most crucial question in the case is raised and about which extended comment must be made.

In the finding, the rule is said to be violated because the catalogue of the plaintiff college lists the names of only two licensed physicians and surgeons as member of the faculty. The Department must be referring to the second of the enumerated requirements, which states that each department head shall be licensed to practice medicine in all of its branches in the State where the medical college is located. That such is the proper reference is borne out by argument of counsel for the Department who say the plaintiff violated this rule by reason of the fact only two staff members hold an unlimited license in Illinois.

The three major departments in the plaintiff college are the Department of Surgery, the Department of the Practice of Osteopathy (which corresponds to the Depart-

◊

ment of Medicine in schools which grant the degree Doctor of Medicine) and the Department of Obstetrics and Gynecology. The head of the Department of Surgery does have an unlimited Illinois license, but the heads of the other departments do not. However, the head of the Department of the Practice of Osteopathy holds licenses to practice medicine in all of its branches in California, Michigan, and Missouri. The head of the Department of Obstetrics and Gynecology, while he does not have an unlimited Illinois license, is licensed to practice obstetrics in Illinois. The other departments of the college are the Department of Anatomy, the Department of Bacteriology and Public Health, the Department of Pathology, and the Department of Physiology and Pharmacology.

This requirement, on its face, does not appear to be arbitrary or unreasonable. To require the head of a department to hold a license in the State where the college is located may seem to be a standard reasonably calculated to help insure the quality of the faculty. For it could be argued that the Department then has the satisfaction of knowing that said department heads are qualified physicians in good standing in the State where they teach and are subject, the same as other physicians practicing within the States, to supervision and control by a board or department charged with responsibility of enforcing the State's policy relative to the practice of medicine in all its branches.

But this requirement was established by the Department despite an explicit statement by the legislature that there shall be no discrimination against colleges by reason of any system or method of treating human ailments which may be taught or emphasized. And when the facts of this record are considered with respect to this statutory provision, especially in the light of the legislative history discussed above, we are convinced that the requirement is unreasonable and discriminatory as applied to the plaintiff college.

First, the plaintiff college has been approved by the Department so that its graduates may take an examination for a limited license. The examination for a limited license and for an unlimited license is identical with the exception that applicants for an unlimited license are also questioned on *materia medica,* therapeutics, surgery, obstetrics, and theory and practice. The undisputed evidence in this record is that the instruction given at the plaintiff college on these subjects is equal to that given in colleges approved by the Department, considered both quantitatively (hours devoted to subject, textbooks used, etc.) and qualitatively (teaching ability of the faculty, etc.) Indeed, apart from the failure to hold unlimited licenses in Illinois, the background, education and ability of the heads of departments, as well as of the remainder of the faculty, are not said to be or demonstrated to be in any way inferior to those of men who staff colleges which have received departmental approval.

Second, the plaintiff's educational program has been fully approved by every agency, both Federal and State, to which it has applied, with the exception of the Department in Illinois. Its graduates are permitted to take examinations for an unlimited license to practice medicine in all branches in 31 States plus the District of Columbia and Hawaii.

Third, as already related, the legislative history in Illinois regarding the osteopathic profession is replete with examples of discrimination. To its credit, however, the legislature enacted section 20 of the act in an effort to insure just treatment for osteopaths and others similarly situated, but this record shows that the Department has still failed to desist from that type of practice which was condemned by this court and the legislature as long ago as 1923. One instance from the evidence will illustrate. One of the plaintiff's staff, who holds an unlimited license to practice medicine in Colorado, made an application for a

full license in Illinois under the reciprocity provisions of the Illinois act. The Department, however, refused his application, and in a letter to him dated July 21, 1950, said "the Illinois Medical Practice Act does not provide for the acceptance of a diploma of graduation from an osteopathic college as a basis for issuance of a medical license either by reciprocity or examination." This shows the difficulty encountered by the plaintiff college in attempting to meet the requirement under consideration, and the Department's attitude further indicates that the purpose of the rule is to prevent the plaintiff college (or any osteopathic college for that matter) from qualifying rather than to safeguard the public from incompetent members of the healing arts profession.

Significantly, the list of the 80 colleges approved by the Department is identical with those approved by the American Medical Association, which regards the practice of osteopathy as an unscientific, cultist practice. The entire membership of the Medical Examining Committee is composed of men who hold the degree of Doctor of Medicine and are members of the American Medical Association.

Finally, here again the Department has made apparent exceptions in the enforcement of the rule, for the evidence shows that there are several of the 80 approved colleges which have some heads of departments who are not licensed to practice medicine in all branches in the State where the college is located or even have any type of healing art degree, be it a Doctor of Medicine (M.D.) or a Doctor of Osteopathy (D.O.)

*Finding No. 5* recited that the number of anatomy tables provided by the plaintiff college is inadequate for the number of students in the freshman class. It is said the plaintiff has only 12 tables for 68 students, and the usual practice followed by approved medical colleges is four students to one table. This finding does not state the violation of a rule or regulation of the Department; there-

fore, disapproval of the college could not be based, even in part, upon the ground stated. The evidence shows that there is nothing in the rules specifying the number of tables for dissection, but there is a requirement that each student must dissect the lateral half of a cadaver, which means two students to a cadaver. However, because of the shortage of cadavers none of the medical schools in Chicago can comply with this rule, and the plaintiff receives cadavers by allocation from an association of which a representative of the plaintiff college is a member, in the same ratio to the number of students as the other approved medical colleges in Chicago.

*Finding No. 6* recited a failure to comply with a rule of the Department providing that the work of a student at all times shall be under the guidance of a competent instructor who shall hold a license to practice medicine and surgery in all its branches. The Department states that it is impossible for the plaintiff college to meet this requirement since there are only two physicians and surgeons on the faculty who are licensed in Illinois. But the rule does not say the supervision must be under one who is licensed in Illinois in all branches. Were it to so provide, it would be subject to the same objections pointed out with regard to finding No. 4. But since the rule does not require the supervising instructor to be licensed in Illinois, it is sufficient to point out that plaintiff college literally complies with this rule. Many of the staff are licensed in other jurisdictions to practice medicine in all branches, and so far as the record is concerned, it is undisputed that the supervision of students is adequate and that each is, in fact, under the guidance of a competent instructor who is trained in all branches of medicine and who holds a.license to practice his art in all its branches.

Summarizing, it is the opinion of this court that findings No. 3 and No. 6 are contrary to the manifest weight of the evidence and must be set aside. Finding No. 5 does

not state the violation of a rule of the Department and is, therefore, set aside. Findings No. 1, No. 2, and No. 4 are nullified because the uncontradicted evidence in the record demonstrates that the requirements stated as applied to this plaintiff are violative of section 20 of the Medical Practice Act.

The grounds for denying recognition to the plaintiff college are all invalid; therefore, at the time of said order by the Department the plaintiff was qualified as a college reputable and in good standing whose graduates are eligible to take the examination for a license to practice medicine in all its branches in Illinois. The judgment of the Appellate Court is affirmed and the cause is remanded to the Department with directions to expeditiously determine whether any changes have occurred subsequent to that time which justify withholding approval. Said determination is ordered to be made with the object of effectuating the manifest intention of the legislature as elaborated in this opinion.

*Judgment affirmed, and cause remanded, with directions.*